IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SHERYL A. KATTAN, et al.,
          Plaintiffs,

v.                                                     Civil Action No. 3:21cv803

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
          Defendant.

## OPINION

The plaintiffs, Sheryl A. Kattan and Joy D. Abel, contend that their employer, the Virginia Department of Environmental Protection ("DEQ"), violated the Equal Protection Act ("EPA") amendments to the Fair Labor Standards Act ("FLSA") by paying them lower wages than comparable male employees for equal work, requiring equal effort, skill, and responsibility. (ECF No. 1, at 1.)[1] Each plaintiff identifies a single comparator: Kattan identifies Justin Brown, and Abel identifies Brian Wrenn. (ECF No. 31, at 1; *see also* ECF No. 32, at 2.) DEQ "does not contest" that the two men are valid comparators for Kattan and Abel.[2] (*Id.* at 2.) Nevertheless, DEQ moves the Court to grant summary judgment because the salary differences between the plaintiffs and their comparators are "explained by factors other than sex." (*Id.* at 1.)

The Court agrees that the pay discrepancy between Kattan and Brown resulted from a factor other than sex, namely Brown's 2018 competitive salary offer-based raise. Accordingly, the Court will grant DEQ's motion as to Kattan. The Court finds, however, that DEQ fails to establish that

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

[2] "DEQ does not concede that the Comparators performed equal work, but it does not raise this issue on Summary Judgment as to [Kattan and Abel] and their identified Comparators." (ECF No. 31, at 13 n.4.)

a factor other than sex *in fact* explains the stark discrepancy between the starting salaries it offered to Abel and Wrenn. To the contrary, the Court finds that genuine issues of material fact exist as to the two employees' relevant experience and qualifications and DEQ's application of disparate standards when it established each applicant's "current salary" for compensation purposes. As such, the Court will deny DEQ's motion as to Abel.

## I. BACKGROUND

As this Court explained in a recent Opinion resolving similar claims,

> Litigation regarding DEQ's salary policies has gone on in this Court for several years. "On June 1, 2020, four female DEQ employees moved for conditional certification of a collective action for alleged violations of the [EPA] Amendments to the . . . FLSA . . . ."[3] . . . That case ended on July 7, 2021, when the Court concluded that the last remaining plaintiff, a Coastal Planner, failed to establish a prima facie case under the EPA. *See also Polak v. DEQ,* No. 3:20cv270, 2021 WL 2750448, at *2 (E.D. Va. Apr. 27, 2021) (denying Polak's partial motion for summary judgment).

*McGee v. DEQ*, No. 3:21cv268, 2022 WL 3757128, at *2 (E.D. Va. Aug. 30, 2022) (first alteration and footnote in original) (some citations omitted). On May 18, 2021, the *Kattan* plaintiffs[4] filed

---

[3] Once the [C]ourt granted conditional certification, twenty-three additional female employees and former employees . . . "opted in", bringing the number of plaintiffs to twenty-six . . . . The gravamen of the plaintiffs' claims focused on allegations that DEQ violated the EPA by using prior salary history to set starting salaries to the detriment of the female plaintiffs and that the use of prior salary history could not be a legitimate factor other than sex constituting an affirmative defense under the EPA. The parties conducted extensive discovery[,] and on April 5, 2021, the Court granted DEQ's motion for summary judgment on the issue of using prior salary history, holding "that the Fourth Circuit allows employers to raise prior salary as an affirmative defense in EPA cases." [*See Abe v. DEQ.*, No. 3:20cv270, 2021 WL 1250346, at *4 (E.D. Va. Apr. 5, 2021).] On April 6, 2021, the Court granted DEQ's motion to decertify the [p]laintiffs' . . . collective action.

. . . On April 20, 2021, the Court entered the parties' agreed order severing the remaining plaintiffs' claims, leaving only Plaintiff Elizabeth Polak.

[4] The original complaint included Plaintiffs Pamela J. Derk, Cassandra Frysinger, and Cassaundra Porter. Frysinger voluntarily dismissed her claim on February 7, 2022, (ECF No. 15),

2

their complaint in the Norfolk Division of this Court.[5] (ECF No. 1.) On August 18, 2021, DEQ moved to transfer this case to the Richmond Division. (ECF No. 7.) On December 22, 2021, the Honorable Arenda L. Wright Allen granted DEQ's motion. (ECF No. 12.)

In their complaint, the plaintiffs assert that DEQ violated the EPA by paying them "lower wages than those paid to their male colleagues for performing equal work as Environmental Specialist II, [P]ermit [W]riters." (ECF No. 1 ¶ 18.) On August 15, 2022, DEQ moved for summary judgment. (ECF No. 30.) As explained below, the Court will grant in part and deny in part DEQ's motion.

## II. FINDINGS OF FACT[6]

DEQ serves as the environmental agency of the Commonwealth of Virginia, and its main office is in Richmond, Virginia. (ECF No. 31 ¶ 1.) DEQ has six additional "regional offices" around the state. (*Id.*) The Department of Human Resource Management ("DHRM") serves as the central human resources agency for the Commonwealth and "establishes the compensation policies applicable to [DEQ] employees." (*Id.* ¶ 2.) Beginning in September 2000, DHRM policy

---

and Derk and Porter did the same on July 12, 2022, (ECF Nos. 24, 25).

[5] The *Abe*, *McGee*, and *Kattan* complaints include numerous passages of identical text. (*Compare* Civil Action No. 3:20cv270, ECF No. 1 ¶¶ 8–14, 18, 24–31, *with* Civil Action No. 3:21cv268, ECF No. 1 ¶¶ 8–14, 18, 20–44, and Civil Action No. 3:21cv803, ECF No. 1 ¶¶ 8–14, 18, 20–44.)

[6] Local Civil Rule 56(B) directs that the moving party must set forth "'a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue,' as well as citations to the record to support such facts." *Earl v. Norfolk State Univ.*, No. 2:13cv148, 2016 WL 1078280, at *3 (E.D. Va. Mar. 17, 2016) (quoting E.D. Va. Loc. Civ. R. 56(B)). "The local rule further provides that a responsive brief should include a similar 'specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue,' as well as citations to the record." *Id.* (quoting Rule 56(B)). "The local rule expressly permits the Court to assume the truth of any facts identified by the moving party as undisputed that are not expressly controverted by the opposing party." *Id.*

directed DEQ to consider thirteen pay factors when setting a new employee's starting wage. (*Id.* ¶ 3.) The factors included: "(1) agency business needs, (2) budget implications, (3) the employee's duties and responsibilities, (4) internal salary alignment[,] (5) the knowledge, skills, and abilities required" to perform the job, "(6) the long-term impact on the agency, (7) market availability . . ., (8) employee performance, (9) salary reference data (a composite of relevant salary information), (10) total compensation . . ., (11) training, certification, and license requirements . . ., (12) work experience and education", and (13) current salary,[7] with current salary being "the primary factor." (ECF No. 31 ¶¶ 3, 6.) "Under the 2000 Compensation Plan, starting pay was negotiable from the minimum of the assigned salary range . . . up to fifteen percent (15%) of the applicant's current salary."[8] (*Id.* ¶ 5.)

DEQ employees may receive pay increases in various ways. For example, pursuant to DEQ policies, an employee may receive a pay raise by obtaining a competitive written salary offer from an outside employer or "by advancing on DEQ's career path . . . based on satisfying criteria related to their level core competency." (*Id.* ¶¶ 8–9.) As relevant here, DEQ's 2018 Salary Administration Plan, provided:

> When an employee receives an outside higher salary offer, and the employee is deemed critical to the agency's mission and on-going operations, the division director may request that the agency make a competitive offer. The outside employment offer must be in writing and can be from another State agency . . ., or an organization external to the Commonwealth.

(ECF No. 32-10, at 7.)

---

[7] DEQ's 2018 Salary Administration Plan defined "current salary" as "[t]he candidate or incumbent's *present base pay compensation*, which may be reported as an hourly wage, weekly, semi-monthly, monthly or annual salary." (ECF No. 32-10, at 4 (emphasis added); *see also* ECF No. 31-9, at 2 (DHRM's Compensation Manual effective Sept. 25, 2000, through April 25, 2005).)

[8] The Commonwealth utilizes "Pay Bands" to "determine the minimum and maximum salaries for a given position." (*Id.* ¶ 4.)

### A. Sheryl Kattan

Kattan began working for the State Water Control Board as an Environmental Scientist in 1992.[9] (ECF No. 31 ¶ 25.) In 1995, Kattan became an Environmental Specialist Senior in DEQ's Tidewater Regional Office at an annual salary of $29,957.04.[10] (ECF No. 31 ¶ 25; ECF No. 31-1 ¶ 13.) In 2011, the year before DEQ hired Brown, Kattan earned $59,771 annually. (ECF No. 31 ¶ 27.) As of July 2022, Kattan's salary was $77,506. (*Id.* ¶ 27.)

### B. Justin Brown

In November 2012, DEQ hired Brown as an Environmental Specialist II, Permit Writer at a starting salary of $52,500. (*Id.* ¶ 28.) "In September 2018, Brown informed his "superior," Allison Dunaway, that he had received an offer of employment from an environmental consulting company called HDR, Inc."[11] (ECF No. 31 ¶ 29.) In support, "Brown provided email correspondence" in which he sought confirmation of a prior verbal agreement for a starting wage of $37.00 per hour. (*Id.* ¶ 31; ECF No. 31-1, at 56–57.) Dunaway in turn informed DEQ's director of Human Resources ("HR") Peggy Hawkins of Brown's offer. (ECF No. 31, at 9 ¶ 30.) Dunaway relayed her uncertainty to Hawkins about whether Brown's email exchange detailing the

---

[9] The State Water Control Board merged with several other agencies to form DEQ in April 1993. (*See* ECF No. 31-1 ¶ 12.)

[10] DEQ describes this transition as the beginning of Kattan's employment with DEQ. (*See id.*) The plaintiffs assert that Kattan "began her employment with DEQ in November 1997 at a starting salary of $34,943." (ECF No. 32, at 10 ¶ 32.)

[11] The plaintiff's dispute that Brown had, in fact, received an offer from HDR, Inc. and assert that Brown's offer came from an affiliated "staffing company." (ECF No. 32, at 5 ¶ 8.) The plaintiffs also contend that the documentation Brown provided to DEQ was deficient because, among other things, the only person who explained the proposed wage in writing was Brown himself. (*Id.* ¶ 10.) The Court acknowledges these disputes but finds that the relevant facts are whether Brown communicated a proposed outside offer of employment to his superior and whether DEQ relied on that offer when approving Brown's wage increase.

outside offer was sufficient documentation for HR purposes, but she ultimately "recommended that DEQ extend Brown a competitive pay offer to retain him as an employee." (*Id.*; *see also* ECF No. 31-1, at 56–57.) Hawkins determined that the email correspondence legitimately confirmed the outside offer in writing as required by DEQ policy. (ECF No. 31 ¶ 32; ECF No. 31-3, at 10; *see also* ECF No. 33-1, at 6:10–7:10.) Based on Dunaway's recommendation, Hawkins authorized a salary increase to $68,000. (ECF No. 31, at 9 ¶ 32; ECF No. 31-3, at 10; *see also* ECF No. 33-1, at 6:10–7:10.) Brown accepted DEQ's offer, raising his salary to a higher wage than Kattan's for the first time. (ECF No. 31, at 1–2.)

### *C. Joy Abel*

"Abel received a Bachelor of Science degree in Physics from Longwood University and a Master's degree in Civil Engineering from the University of Virginia." (ECF No. 32, at 10 ¶ 33.) From October 1999 until January 2005, Abel worked for the Eastern Research Group as a Lead Environmental Engineer, earning approximately $65,000 annually by the time she left. (ECF No. 31-1, at 11.) Following a difficult pregnancy, Abel left the workforce in 2005 to be a stay-at-home-mom.[12] (ECF No. 31-6, at 2:3–6.)

DEQ hired Abel on September 16, 2013, as a temporary employee (Environmental Specialist II, Permit Writer-Water) earning $21.00 an hour.[13] (*Id.* ¶ 11.) A few months later, in January 2014, DEQ hired Abel as a full-time Environmental Specialist II, Permit Writer-Water. (*Id.* ¶ 15.) For purposes of establishing her "current salary," DEQ considered her hourly temporary

---

[12] Abel also "briefly" worked in "event production for an unknown wage in 2012." (ECF No. 31, at 6 ¶ 12.)

[13] As a temporary employee, DEQ capped Abel's annual hours at 1,500. (ECF No. 31, at 6 ¶ 13.)

6

employee pay. (*Id.* ¶ 16.) "DEQ did not consider her salary from approximately [eight] years earlier." (*Id.*) But, although DEQ's initially offered Abel a salary of $46,000 and categorized Abel as an "entry level" employee, DEQ's HR Director, "Peggy Hawkins ultimately approved a salary of $51,000" and a title level of "Senior." (*Id.* ¶ 17.)

Abel received five pay increases between 2015 and 2022, including four General Assembly approved state employee increases and a "career path" adjustment to Senior II in 2020. (*Id.* at 7 ¶¶ 18–19.) In January 2022, Abel accepted the position of Technical Reviewer and received a salary increase to $74,000 pursuant to a competitive voluntary transfer.[14] (*Id.* ¶ 19.)

### D. Brian Wrenn

DEQ hired Wrenn on April 25, 2014. (*Id.* ¶ 20.) Prior to his employment with DEQ, Wrenn worked as a personal trainer for roughly eighteen months, earning approximately $15,000 per year (or $20.00 per hour). (*Id.* ¶ 21; *see also* ECF No. 31-1, at 35.) Before that, from May 2004 until May 2012, Wrenn worked for the North Carolina Department of Environmental and Natural Resources, Division of Water Quality ("NCDENR"). (ECF No. 31-1, at 36.) When he left NCDENR in 2012, Wrenn earned $70,260 annually.[15] (*Id.* at 36.) For purposes of setting his starting salary, DEQ considered Wrenn's 2012 NCDENR salary as his "current salary". (ECF No. 31, at 7 ¶ 21.) Accordingly, DEQ offered Wrenn a starting salary of $63,000. (*Id.* ¶ 20.)[16] Wrenn

---

[14] For comparison, Abel earned less in 2021 ($62,027) than Wrenn did when DEQ hired him in 2014 ($63,000). (*See id.*)

[15] From December 2001 until March 2003, Wrenn worked for the United States Environmental Protection Agency. (*Id.* at 37.) Wrenn does not have a Master's degree. (*Id.* at 35.)

[16] DEQ also asserts that it "also considered Wrenn's extensive experience working at the NCDENR and the United States Environmental Protection Agency . . . in setting his salary." (*Id.* at 8 ¶ 22.) Abel objects to this fact because DEQ did not include experience on its response to the plaintiffs' interrogatories and because DEQ does not provide contemporaneous evidence of

7

resigned from DEQ in April 2016 with a final salary of $67, 320.[17] (ECF No. 31, at 8 ¶ 24.)

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Likewise, "[a] dispute is genuine if 'a reasonably jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

Upon a motion for summary judgment, the court draws all reasonable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. But when the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing "affidavits" or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

---

whether and how it considered Wrenn's experience in comparison to the other mandatory pay factors. (*Cf.* ECF No. 31-1, at 14–15 (memorandum recommending Joy Abel for full-time employment and summarizing her experience and qualifications as applicable to the job).) Further, Abel argues that "[a] reasonable jury could find that DEQ should have either rejected both candidates' prior jobs as too remote in time or considered both experiences as relevant." (ECF No. 32, at 4–5 ¶ 6.) As discussed below, the Court agrees that a genuine issue of material fact persists as to this issue.

[17] In July of 2015, Wrenn's salary increased to $66,000 pursuant to a competitive voluntary transfer to the position of Environmental Specialist II, Technical Reviewer. (*Id.* at 8 ¶ 23.) Wrenn's transfer and later departure from DEQ do not affect the statute of limitations period for Abel's claims. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 345–46 (4th Cir. 1994) (quoting 29 C.F.R. § 1620.13(b)(5)) ("It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitation period for filing a timely suit under the EPA.").

8

## IV. DISCUSSION

"The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing 29 U.S.C § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). To prevail, an EPA plaintiff "must demonstrate that '(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654–55 (4th Cir. 2021) (citing *Md. Ins. Admin.*, 879 F.3d at 120).

To survive summary judgment, a plaintiff need only present a prima facie case. After a plaintiff has established a prima facie case, however, "the burdens of production *and* persuasion shift to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses." *Md. Ins. Admin.*, 879 F.3d at 120 (emphasis in original) (citing *Brinkley-Obu*, 36 F.3d at 344. A defendant is entitled to summary judgment if the pay differential is based on any of the following: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender."[18] *Md. Ins. Admin.*, 879 F.3d at 120 (citing 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195). A defendant's burden at this stage is heavy, and "a viable affirmative defense under the EPA requires more than a showing that a factor other than sex *could* explain or *may* explain the salary disparity. Instead, the EPA requires that a factor other than sex *in fact* explains the salary." *Id.* at 123 (emphasis in original). Thus, "once the plaintiff has established a prima facie case[,] the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense

---

[18] An employer may raise prior salary as an affirmative defense in EPA cases as a "factor other than sex." *See Abe*, 2021 WL 1250346, at *2 (quoting 29 U.S.C. § 206(d)(1)).

so convincingly that a rational jury could not have reached a contrary conclusion." *Id.*

Because DEQ does not contest that Kattan and Abel have established a prima facie case sufficient to survive summary judgment, the Court turns to DEQ's proffered reasons for the wage discrepancies.

### A. The Defendant's Affirmative Defenses

DEQ bases its motion for summary judgment on two arguments. First, it asserts that "[t]he salary difference between Kattan and . . . Brown is explained by . . . Brown's 2018 salary increase resulting from a competitive salary offer from an outside employer." (ECF No. 31, at 1.) Second, DEQ contends that "[t]he salary difference between Abel and . . . Wrenn is explained by . . . Wrenn's prior salary and his experience." (*Id.*) The Court addresses each argument in turn.

#### 1. Kattan and Brown

The parties agree that one way an employee may secure a pay increase at DEQ is through a competitive salary offer. DEQ increased Brown's salary in 2018 pursuant to a competitive salary offer. (*See* ECF No. 32-9 (Brown's 2018 salary offer); ECF No. 32-17 (Deposition of A. Dunaway).) Accordingly, DEQ asserts that the ensuing pay discrepancy between Kattan and Brown was based on a factor other than sex. Despite ample evidence that DEQ increased Brown's salary exclusively and explicitly because of its determination that he received a competitive offer, the plaintiffs argue that summary judgment is improper because "DEQ did not investigate the nature of the salary offer, the duration of the job, the actual terms, or whether th[e] offer reflect[ed] the experience or skills required in [Brown's] DEQ position." (ECF No. 32, at 19.) The plaintiffs do not allege that DEQ denied such a salary increase to a female employee who received an offer similar to Brown's or identify any other meaningful evidence of pretext.

"The [EPA] is a powerful tool, permitting an employee to prevail on a wage discrimination

10

claim with no evidence of intentional discrimination. But this tool must be tempered by adherence to its provisions." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). Accordingly, the Court must take care not to act as "a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." *Id.* at 207 (quoting *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005)). The Court finds that even if DEQ erred in approving a competitive salary offer increase to Brown in 2018, its "decision would still serve as a non-sex-based explanation for the pay disparity." *Id.* at 206. Because no rational jury could reach a contrary conclusion based on the undisputed facts presented, the Court finds that DEQ is entitled to summary judgment as a matter of law as to Kattan's claim.

### 2. *Abel and Wrenn*

For purposes of summary judgment, DEQ concedes that it hired both Wrenn and Abel as full-time Permit Writers in 2014 at significantly different starting salaries. DEQ asserts that the wage discrepancy was based on DEQ's reference to Wrenn and Abel's respective prior salaries. In Abel's case, DEQ looked no further than Abel's current salary as a temporary employee with DEQ itself. In Wrenn's case, DEQ overlooked Wrenn's eighteen-month stint as a personal trainer and instead used his NCDENR salary from roughly twenty-three months prior as his "current salary" for compensation purposes. DEQ bases its defense on testimony from HR Director Hawkins. Hawkins explained that despite DHRM policy to the contrary, (*see* ECF No. 32-10, at 4; *see also* ECF No. 32-12, at 2:14–3:25),[19] "current is not always the last job that the applicant . . . held," (ECF. 32-21, at 2:22–24 (Hawkins Dep.).) Hawkins further explained that "[i]f a female applicant had taken time off to raise her children," then DEQ would have to consider "how many

---

[19] (*See also* ECF No. 32-12, at 2:21–23 ("[C]urrent salary was the salary that the individual was making at the time that an offer would have come from me to the individual.").)

11

years have gone by" when deciding whether to apply the woman's actual current salary or a past prior salary for compensation purposes. (*Id.* at 3:6–11.) According to Hawkins, this gray area exists because "[p]ositions[,] . . . policies[,] . . . [and] Federal and State regulations change." (*Id.* at 3:11–12.) DEQ thus asserts that Wrenn's "prior salary history with NCDENR" was a factor other than sex which justified Wrenn receiving higher pay than Abel. (ECF No. 31, at 16.) The Court finds that based on this evidence, DEQ does not establish that the wage disparity between Wrenn and Abel was *in fact* justified by DEQ's reliance on prior salary as a sex-neutral metric. *See Md. Ins. Admin.*, 879 F.3d at 123. Here, a clear issue of material fact exists as to whether DEQ's disparate application of compensation policies to prospective employees of different sexes was based on a sex-neutral reason.

Indeed, perhaps to avoid the reasonable inference that impermissible bias influenced the application of disparate standards to employees of different sexes, DEQ also asserts that Wrenn's salary offer reflected his many years of relevant experience for the position of Senior Permit Writer-Water. (ECF No. 31, at 16.) In response, Plaintiff Abel notes that DEQ failed to assert "relevant experience" as an affirmative defense in its responses to Abel's interrogatories. (ECF No. 32 at 4 ¶ 6; *see* ECF No. 32-6.) Nevertheless, the Court will consider DEQ's proffered defense.

The record reveals evidence that Wrenn brought over a decade of potentially relevant experience with him to DEQ. Indeed, in her declaration, Hawkins stated that she considered Wrenn's experience both at NCDENR and with the EPA some eleven years prior when extending his offer of employment. (ECF No. 31-3, at 4 ¶ 21.) Further, Hawkins testified during her deposition that, "Put[ting] them side by side, [she could] see why Brian Wren would make more money." (ECF No. 32-21, at 9:15–16.) But close examination of the record also reveals a genuine issue as to whether a relevant experience differential existed between Wrenn and Abel, and, if so,

whether it convincingly explains the discrepancy. Abel asserts that her previous experience both with the Eastern Research Group and with DEQ as a part-time employee rendered her just as qualified—if not more so—to perform the actual duties required by the Permit Writer position as Wrenn.[20] (ECF No. 32-8; *see also* ECF No. 31-1, at 14–15 (summary of Abel's relevant experience and qualifications as applied to the position).) And, although Hawkins testimony generally reflects her current opinion that the salary differential makes sense in hindsight, absent from the record is anything which indicates how and why DEQ reached and justified the decision to pay Wrenn $12,000 more to perform the same "Senior" level job as Abel *in 2014*. *See Md. Ins. Admin.*, 879 F.3d at 123 (explaining that "some contemporaneous evidence regarding [the comparator's] hiring," did not entitle the defendant to summary judgment because "no evidence shows that the decision setting [his] salary was actually made on that basis).

DEQ bears the burden of establishing that that Wrenn's higher wages were *in fact* based on factors other than sex. Based on the undisputed facts before the Court, it finds that a reasonable jury could reject DEQ's defense as to Wrenn and find that DEQ's proffered justifications for the differential are merely pretexts for sex discrimination. Accordingly, DEQ fails to meet its burdens of production and persuasion and is not entitled to summary judgment as a matter of law. The Court will deny DEQ's motion for summary judgment.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant DEQ's motion for summary judgment as to Kattan and deny it as to Abel.

The Court will enter an appropriate Order.

---

[20] Abel contends that "most of Wrenn's experience was not relevant to the tasks of a Permit Writer-Water at DEQ" and provides a point-by-point analysis of why this is so. (ECF No. 32, at 22–23; *see also* ECF No. 32-8.)

13

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 15 November 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge